

Filed in open
Court 5/22/2025
LB



**U.S. Department of Justice**

*Leah B. Foley*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*     *John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

May 21, 2025

Young Paik
Alexandra Deal
PAIK DEAL LLP
6 Beacon Street, Suite 815
Boston, MA 02108

    Re:    United States v. Jose Vasquez, a/k/a "Cholo," a/k/a "Little Crazy"
            Criminal No. 17-10125-WGY

Dear Counsel:

    The United States Attorney for the District of Massachusetts (the "U.S. Attorney") and your client, Jose Vasquez ("Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure ("Rule") 11(c)(1)(C):

    1.    <u>Change of Plea</u>

    As soon as possible, Defendant will plead guilty to Count Two of the Second Superseding Indictment charging him with violent crime in aid of racketeering activity, in violation of Title 18, United States Code, Section 1959(a)(1). Defendant admits that he committed the crime specified in this count and is in fact guilty of that offense.

    2.    <u>Penalties</u>

    Defendant faces the following maximum penalties: incarceration for life; supervised release for 5 years; a fine of $250,000; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Second Superseding Indictment.

3. <u>Rule 11(c)(1)(C) Plea</u>

In accordance with Rule 11(c)(1)(C), if the Court accepts this Plea Agreement, the Court must include the agreed disposition in the judgment. If the Court rejects any part of this Plea Agreement, the U.S. Attorney may void the agreement and/or Defendant may withdraw from it. Defendant may not withdraw Defendant's plea for any other reason.

Should the U.S. Attorney void the agreement and/or Defendant move to withdraw Defendant's guilty plea, Defendant agrees to waive any defenses based upon statute of limitations, the constitutional protection against pre-indictment delay, and the Speedy Trial Act for all charges that could have been brought as of the date of this Plea Agreement.

4. <u>Sentencing Guidelines</u>

The parties agree, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 40:

  a) Defendant's base offense level is 43, because Defendant's underlying crime or racketing activity involved a first degree murder on December 18, 2010 (USSG § 2E1.3(a)(2) and § 2A1.1(a)); and

  b) Defendant's offense level is decreased by 3 levels, because Defendant has accepted responsibility for Defendant's crime (USSG § 3E1.1).

Defendant understands that the Court is not required to follow this calculation. Defendant also understands that the government will object to any reduction in Defendant's sentence based on acceptance of responsibility, and may be released from the parties' agreed-upon disposition in Paragraph 5 if: (a) at sentencing, Defendant (directly or through counsel) indicates that Defendant does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crime to which Defendant is pleading guilty; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

5. <u>Agreed Disposition</u>

The parties agree on the following sentence:

  a) incarceration for between 240-300 months, which term of imprisonment is to run concurrently from the date of the Judgment in this case with the remainder of the term of imprisonment previously imposed in <u>United States v. Jose Vasquez</u>, Cr. No. 15-10338-FDS;

  b) a fine within the Guidelines sentencing range as calculated by the parties in

Paragraph 4, excluding departures, unless the Court finds that Defendant is not able, and is not likely to become able, to pay a fine;

c) 60 months of supervised release;

d) a mandatory special assessment of $100, which Defendant must pay to the Clerk of the Court by the date of sentencing;

e) restitution, if applicable; and

f) forfeiture as set forth in Paragraph 7.

Defendant agrees that all criminal monetary penalties, including special assessment, restitution, forfeiture, and/or fine imposed shall be due and payable immediately, and further agrees that any Court-ordered repayment schedule does not preclude further enforcement or collection by the United States.

6. <u>Waiver of Appellate Rights and Challenges to Conviction or Sentence</u>

Defendant has the right to challenge Defendant's conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that Defendant's conviction or sentence should be overturned.

Defendant understands that Defendant has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

a) Defendant will not challenge Defendant's <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

b) Defendant will not challenge Defendant's <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

The U.S. Attorney agrees not to appeal the imposition of a sentence within the range agreed to by the parties in paragraph 5.

Defendant understands that, by agreeing to the above, Defendant is agreeing that Defendant's conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge Defendant's conviction and sentence regardless of whether Defendant later changes Defendant's mind or finds new information that would have led Defendant not to agree to give up these rights in the first place.</u>

3

Defendant is agreeing to give up these rights in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that Defendant's lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in misconduct serious enough to entitle Defendant to have Defendant's conviction or sentence overturned.

7. Forfeiture

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

8. Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to Defendant's criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

9. Breach of Plea Agreement

Defendant understands that if Defendant breaches any provision of this Agreement, violates any condition of Defendant's pre-trial release or commits any crime following Defendant's execution of this Plea Agreement, Defendant cannot rely upon such conduct to withdraw Defendant's guilty plea. Defendant's conduct, however, would give the U.S. Attorney the right to be released from the U.S. Attorney's commitments under this Agreement, to pursue any charges that were, or are to be, dismissed under this Agreement, and to use against Defendant any of Defendant's statements, and any information or materials Defendant provided to the government during investigation or prosecution of Defendant's case—even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Defendant also understands that if Defendant breaches any provision of this Agreement or engages in any of the aforementioned conduct, Defendant thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

10. Who is Bound by Plea Agreement

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

4

11. <u>Modifications to Plea Agreement</u>

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

\* \* \*

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Christopher Pohl.

Sincerely,

LEAH B. FOLEY
United States Attorney

By: /s/ Jared Dolan
Jared Dolan for Stephen Hassink
Chief, Narcotics and Money Laundering Unit

Christopher Pohl
Brian A. Fogerty
Meghan C. Cleary
Assistant U.S. Attorneys

ACKNOWLEDGMENT OF PLEA AGREEMENT

I have had this letter read to me in my native language and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crime I am pleading guilty to, and the maximum penalties for that crime. I have discussed the Sentencing Guidelines with my lawyer, and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me, and we have had enough time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest.

_____
Jose Vasquez
Defendant

Date: 5-22-25

I certify that Jose Vasquez has had this Plea Agreement read to him in his native language and that we have discussed what it means. I believe he understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

_____
Young Paik, Esq.
Alexandra Deal, Esq.
Attorneys for Defendant

Date: 5/22/25

## STATEMENT OF FACTS

In conjunction with Paragraph 1 of the letter dated May 21, 2025, between my attorneys Young Paik, Esq., and Alexandra Deal, Esq., and the United States Attorney for the District of Massachusetts, setting forth the agreement between myself and the United States Attorney for the above-referenced matter, I agree that I am guilty of the offense to which I will plead guilty. I also agree that had the case proceeded to trial, the United States would have presented evidence, including but not limited to (i) witness and expert witness testimony; (ii) physical and other evidence recovered from the crime scene, including a silver knife; (iii) consensual recordings; and (iv) business records to prove, beyond a reasonable doubt, the following facts, among others, relating to events that occurred in the District of Massachusetts:

1. At all relevant times, MS-13 was a violent, transnational criminal organization involved in a variety of criminal activities, including acts involving murder, assault, extortion, kidnapping, obstruction of justice, and drug trafficking in the District of Massachusetts and elsewhere in the United States, as well as El Salvador, Honduras, and Mexico. The defendant JOSE VASQUEZ, also known as "Cholo," also known as "Little Crazy," was a member of MS-13.

2. MS-13 was organized into groups known as "cliques" that held regular meetings to coordinate gang activities. In the District of Massachusetts, some of the cliques were identified by names such as the Trece Loco Salvatrucha (TLS), Everett Loco Salvatrucha (ELS), Eastside Loco Salvatrucha (ESLS), Enfermos Criminales Salvatrucha (ECS), Syko Loco Salvatrucha (SLS), and the Uniones Locos Salvatrucha (ULS or Uniones).

3. Each clique was run by the senior leader, who was designated the "*Primera Palabra*," or "First Word." The other members and associates of the clique took their orders from the First Word. The leaders of the respective cliques attended larger general meetings to manage gang operations on a regional and international level.

4. MS-13 members attended clique meetings and were required to pay dues. MS-13 members obtained money through illegal means, including, but not limited to, extortion and drug trafficking. The money was provided to clique leaders and used to finance clique activities such as the purchase of firearms, to provide support for clique members who were in jail, and to send funds to MS-13 leadership in El Salvador to support the gang there.

5. MS-13 recruits were indoctrinated into MS-13 rules. One prominent rule encouraged MS-13 members and associates to confront, fight, and kill rival gang members, known as "*chavalas*." Another prominent rule required MS-13 members and associates to identify individuals cooperating with law enforcement authorities. When such individuals were identified, MS-13 members and associates were required to notify senior gang members, who typically ordered (*i.e.*, "green lighted") the killing of the individuals cooperating with law enforcement authorities.

6. In order to preserve, expand, and protect the power, reputation, and territory of MS-13, its

members and associates were required to use violence, threats of violence, and intimidation. These required acts of violence included acts involving murder and assault, including with firearms, machetes, and knives. MS-13 members and associates maintained and enhanced their status in the gang, and the overall reputation of the gang, by participating in such violent acts.

7. MS-13, including its leadership, its members, and its associates, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The above-described MS-13 enterprise, through its leadership, its members, and its associates, engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), namely, acts involving murder, in violation of the laws of the Commonwealth of Massachusetts, and offenses involving the distribution of controlled substances, in violation of 21 U.S.C. §§ 846 and 841.

8. On or about December 18, 2010, in Chelsea, in the District of Massachusetts, the defendant JOSE VASQUEZ, a/k/a "Cholo," a/k/a "Little Crazy," for the purpose of gaining entrance to and maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, did murder Joaquin Aguilar, in violation of Massachusetts General Laws Chapter 265, Section 1 and Chapter 274, Section 2, to wit, did murder Joaquin Aguilar deliberately and with premeditated malice aforethought.

9. Specifically, at about 7:10 p.m., officers responded to a 911 call on Sixth Street in Chelsea and found Aguilar suffering from multiple stab wounds. Aguilar was transported to Massachusetts General Hospital where he died. According to the Office of the Chief Medical Examiner (OCME), Aguilar died from multiple stab wounds to his back and chest. The autopsy report noted that Aguilar had a crown tattoo on his hand.

10. At trial the government would call a cooperating witness to testify, who was himself a member of MS-13. According to the cooperating witness, on the day of the murder, he met Aguilar in front of a McDonald's in Allston. WILLIAM PINEDA PORTILLO, an MS-13 member from Everett who the cooperating witness knew as "Salvador," picked them up in his dark green Ford "Expedition-like" truck. The cooperating witness identified VASQUEZ, who he knew as an MS-13 member from Somerville named "Cholo," and others in the truck. The cooperating witness advised that when they got to Chelsea, PINEDA PORTILLO dropped the group off, and the five men—Aguilar, the cooperating witness, VASQUEZ, and two other members of MS-13—walked through a hole in a fence by nearby railroad tracks to the area under the Fifth Street on-ramp to Route 1.

11. According to a cooperating witness, once in the secluded area under the highway, an MS-13 member hit Aguilar in the head with a rock and another MS-13 member stabbed Aguilar with a machete. During the attack, VASQUEZ stabbed Aguilar with a silver knife. A

medical examiner determined that Aguilar died from stab wounds. According to the cooperating witness, VASQUEZ and the others had planned to murder Aguilar for approximately a week before his murder because VASQUEZ and the other participants believed Aguilar was a gang rival.

12. The cooperating witness described VASQUEZ as using a small silver kitchen knife to stab Aguilar. Law enforcement recovered a silver knife from the scene where Aguilar was stabbed. A latent fingerprint examiner with the Massachusetts State Police (MSP) identified VASQUEZ's palm print on the knife. A forensic examiner with MSP determined that Aguilar's blood was also on the silver knife.

13. The cooperating witness fled after the murder. Weeks later, an individual working with Homeland Security Investigations (HSI), who would testify at trial here as a Material Witness (the Material Witness), consensually recorded a January 26, 2011 MS-13 meeting in an apartment in East Boston. The Material Witness recorded MS-13 gang members disciplining the cooperating witness for leaving Massachusetts without permission from the gang after he participated in Aguilar murder. The Material Witness recorded the cooperating witness informing the group, "You think I'm going to spend 25 years in prison? That's the reason why I left here without barely telling anyone. The police was on my ass. I haven't told the clique about the murder of an enemy the other day, ok. That guy was an enemy in El Salvador." According to the Material Witness, JOSE VASQUEZ, a/k/a "Cholo" or "Little Crazy," was present for this meeting.

14. At the time of the Aguilar murder, VASQUEZ was 17 years old. In the years after the murder, VASQUEZ's stature grew in MS-13, which is consistent with the MS-13 tenet that members enhance their status by participating in acts of violence, including murder. By 2015, VASQUEZ had become the "first word" of the TLS clique in Somerville.